UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MAUREEN B. AVOURIS,            )
                               )
          Plaintiff,           )
                               )
     v.                        )   Case No. 4:11CV1793 FRB
                               )
CAROLYN W. COLVIN,[1] Commissioner )
of Social Security,            )
                               )
          Defendant.           )


**MEMORANDUM AND ORDER**

          This matter is before the Court on plaintiff Maureen B.

Avouris's appeal of an adverse decision of the Social Security

Administration.   All matters are pending before the undersigned

United States Magistrate Judge, with consent of the parties,

pursuant to 28 U.S.C. § 636(c).

          **I.   Background and Procedural History**

          On April 26, 2010, plaintiff applied for Disability

Insurance Benefits ("DIB") under Title II of the Act, alleging

disability beginning September 18, 2009.   (Administrative

Transcript ("Tr.") 105-11).

          Plaintiff's application was denied, (Tr. 54-58), and she

requested a hearing before an administrative law judge ("ALJ").

---

          [1]Carolyn W. Colvin became the Acting Commissioner of Social
Security on February 14, 2013.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant
in this case.  No further action needs to be taken to continue
this suit by reason of the last sentence of 42 U.S.C. § 405(g).

(Tr. 61-62).  On April 13, 2011, a hearing was held before an ALJ (Tr. 20-45), and the ALJ issued an unfavorable decision on February 7, 2011.  (Tr. 5-19).

Plaintiff sought review of the ALJ's decision with defendant agency's Appeals Council, which denied plaintiff's request for review on September 1, 2011.  (Tr. 1-4).  The ALJ's decision thus stands as the Commissioner's final decision subject to review in this Court.  42 U.S.C. § 405(g).

## II.   Evidence Before the ALJ

A.   Plaintiff's Testimony

Responding to questions from the ALJ, plaintiff testified that she was 54 years of age, and that she had finished high school and obtained certification as a certified nurse's assistant ("CNA").  Plaintiff described past work in telephone sales, home health care, customer service, and telemarketing.  (Tr. 24-25).  Plaintiff testified that she stopped working in 2009 because of a fall and lower lumbar back pain.  (Tr. 25-26).

Plaintiff testified that she had applied for unemployment benefits, and when doing so represented that she was ready, willing and able to work.  (Tr. 26).  When asked whether that was true, plaintiff replied "[s]ometimes it was.  I mean, sometimes, no.  I just - - I didn't have a choice.  I mean, you know, I didn't have any income.  I didn't have any money." (Id.)  Plaintiff testified that she never declined unemployment benefits due to an inability to work.  (Id.)  She testified that she received unemployment for about six months, then had it again, and had not had it for about

one month.   (<u>Id.</u>)

The ALJ noted that plaintiff was using a walker, and asked plaintiff whether the walker had been prescribed by a doctor. (Tr. 27).   Plaintiff's response to that question, and the subsequent exchange between plaintiff and the ALJ, was as follows:

*Answer (by plaintiff)*: [y]eah, they both told me to go ahead and use it.  A Dr. Icolse [PHONETIC] at St. Louis U, and I go to Dr. James Compton [PHONETIC], he's a M.D.

*Question (by the ALJ)*:   Well, the doctors just said it was okay to use it?

*A.*        Well, when I asked them what can I do about it. He said, if you can get a walker, if Medicaid will pay for it, if you need a cane, I was kind of told, yeah, use it.  So that's what I'm - -

*Q.*        Well, usually Medicaid pays for it after there's a prescription.  Was there any prescription for that walker?

*A.*        Oh, no.  He didn't give me a prescription for it.  I didn't know that I could get one.

*Q.*        And when did you start using the walker?

*A.*        Oh, gosh.  It's been about a year now.

*Q.*        What happened about a year ago that you decided you needed to use this walker?

*A.*        I can't - - I can't go up and down steps - -

*Q.*        Well, a walker doesn't help with that.

- 3 -

*A.*        I know.  But I tried to you know – – even
though – – I mean, because my – – I just – – I can't do
about 90 percent of what I used to do.  If I don't have
this, even walking with it, you know, it's difficult.  I
can't walk far with it.  Like I said, I can't do the
steps.  I need it to stabilize my walking.  I can't stand
up straight, and I – – it affects the legs, the feet go
numb.  So – –
(Tr. 27-28).

The ALJ then asked whether a doctor had said that
plaintiff had any type of condition that could be corrected by
surgery, and plaintiff responded: "[t]hey told me that I might want
to consider surgery, yes.  They said I have spinal stenosis with
spondylolisthesis.    That's,  if  I'm  saying  that  correctly.
Degenerative arthritis, osteoporosis, and scoliosis on the right
side." (<u>Id.</u>)

Plaintiff then responded to questions from her attorney.
She testified that she falls forward if she does not use a walker.
(<u>Id.</u>)  She testified that she had pain in her lower back, mainly on
the left side, that radiated into her legs, knees and feet.  (<u>Id.</u>)
She testified that she dropped things, and that she had been told
that this was perhaps due to a condition of her spine.  (Tr. 29).
Plaintiff testified that she had undergone physical therapy and was
taking Meloxicam,[2] Relafen,[3] Flexeril,[4] Calcium and Vitamin D, and

---

[2]Meloxicam (also known as Mobic) is a non-steroidal anti-
inflammatory medication used to relieve pain, tenderness,
swelling and stiffness caused by osteoarthritis and rheumatoid
arthritis.   http://www.nlm.nih.gov/medlineplus/
druginfo/medmaster/a601242.html

[3]Relafen, or Nabumetone, is a non-steroidal anti-
inflammatory medication that is used to relieve pain and other

- 4 -

that her medications caused stomach upset, drowsiness, and frequent urination.  (Tr. 29-30, 36).  She had not undergone injections but was looking into doing so.  (Tr. 29).

Plaintiff testified that she lived alone but had a daughter who came in and helped her with housework.  (Tr. 30).  She testified that she spent her days watching television, going outside on nice days, and reading.  (Id.)  She stated that she tried to go to church but did not always make it every Sunday, and that her daughter went with her to the grocery store.  (Id.)

Plaintiff testified that she had problems sitting because "[i]t pulls on the back, the feet.  Now, my feet are numb, my legs. It's a - - it hurts."  (Tr. 31).  She testified that she could sit for only fifteen or twenty minutes.  (Id.)  When asked how long she could stand before needing to sit down or lay down, plaintiff testified: "[w]ell, without the walker, I can't stand - - I can't. I have to hold on to something.  But, with the walker, you know, I don't know, fifteen minutes or so to stand the entire time."  (Id.) When asked how far or how long she could walk with the walker before needing to stop and rest, plaintiff testified: "[a]bout two feet maybe, and then I have to stop and reposition myself, you know, then keep going."  (Id.)

_____

symptoms caused by osteoarthritis and rheumatoid arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692022.html

  [4]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries.  http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/a682514.html

Plaintiff testified that she had trouble lifting a gallon of milk because "[w]ell, first of all, I can't - - I have to hold the walker, so it's - - I - - it's hard for me to grab it and move it at the same time, and then sometimes when I'm picking up things, like I said, out of the blue, I'll drop something.  I don't do any lifting."  (Tr. 32).  Plaintiff also testified that lifting a gallon of milk hurt her back and legs.  (<u>Id.</u>)  Plaintiff testified that she had numbness in her feet every day, and swelling in her lower back, legs, hips, knees and hands.  (<u>Id.</u>)  She testified that she had shooting pains in her lower back, thighs, buttocks, feet, and in the back of her legs.  (Tr. 33).  Plaintiff testified that she used a grabber to pick up things from the floor.  (<u>Id.</u>)  She testified that she had pain with twisting her body from side to side, reaching her arms out in front of her and to the sides.  (<u>Id.</u>)

Plaintiff testified that Dr. Compton told her that she was unable to work.  (Tr. 34).  She testified that Drs. Compton and Eichholz told her to lift no more than five pounds and to not "do the stairs if you can't, which that is a nightmare, doing the steps.  Basically, they both told me this condition requires a lot of rest, limited mobility, which I already have, the meds, and eventually, surgery."  (Tr. 34).

Plaintiff testified that she had problems getting dressed in that she could not bend forward and had to sometimes ask her daughter to come over and help her.  (Tr. 34-35).  Plaintiff testified that it was difficult for her to put on and take off her

- 6 -

shoes and socks, and that she sometimes used a broomstick to push her socks off. (Tr. 35). Plaintiff testified that she had trouble bathing, in that she did not have handles in her shower and had difficulty getting herself over the tub, and that it took 15 to 20 minutes to get one foot in. (Id.) She testified that she kept a walker outside the shower, did not stay in long, used a shower chair, and could no longer lie down in the bathtub as she used to do. (Id.)

Plaintiff stated that pain interrupted her sleep, and that she napped during the day. (Tr. 36). She testified that she liked to read, but could no longer engage in hobbies such as exercising, gardening, and church activities. (Tr. 37-38). Plaintiff testified that there were days she stayed in bed all day due to pain. (Tr. 38). She testified that she spent three or four hours per day with her feet propped up. (Tr. 41). Plaintiff testified that she sometimes had trouble picking up her feet when she walked, and that her left foot would go numb to the point she could not pick it up or lift it. (Tr. 39-40). She stated that she had some trouble pushing the walker "almost all the time" and had trouble pushing on her left side. (Tr. 40). Plaintiff testified that she had gained 80 pounds in the last year, and that this may be attributable to medication. (Tr. 40-41).

Plaintiff then responded to questioning from ALJ. Plaintiff testified that she had driven herself to the hearing. (Tr. 42). She testified that, when she went to Dr. Eichholz's office in November of 2010 and January of 2011 she was using a

- 7 -

walker.  (Id.)

    B.   Medical Records

        Records from the Morris Family Chiropractic clinic indicate that plaintiff was seen by chiropractor Gary Morris, D.C. on December 23, 2008 after being injured when she was knocked to the ground and bitten by a dog.  (Tr. 163).  Plaintiff denied experiencing pain or discomfort prior to this incident.  (Id.)  She complained of sleeping difficulty, irritability, dull intermittent headache of increasing severity, intermittent upper back pain, constant sharp severe lower back pain, shooting pain and numbness in her left leg, and numbness in her left foot and toes and spasm of her left toes.  (Id.)  Examination was positive for, inter alia, decreased range of motion, decreased flexion and extension, decreased rotation, neck pain, muscular tightness, tenderness in the cervical spine.  (Tr. 163-64).  No marks were visible from the dog bite.  (Tr. 164).

        Dr. Morris diagnosed cervical, thoracic, and lumbar sprain/strain, headache, and lumbosacral radiculitis/neuritis.  (Id.)  Dr. Morris advised plaintiff to use ice packs, and to have cervical, thoracic and lumbar spine x-rays performed that day.  (Id.)  Plaintiff reported that she had a previous engagement and would be unable to have the x-rays performed that day, but would do so the following day.  (Id.)

        On December 26, 2008, plaintiff underwent radiological testing at St. Anthony's Medical Center.  X-rays of plaintiff's cervical spine revealed degenerative changes at C6-C7, and slight

- 8 -

grade I anterolisthesis of C4 on C5.   (Tr. 166).   X-rays of plaintiff's thoracic spine revealed slight scoliosis and mild degenerative changes at C6-C7, and slight grade I anterolisthesis of C4 on C5.   (Tr. 168).   X-rays of plaintiff's lumbar spine revealed grade I anterolisthesis of L4 on L5, degenerative changes in the lumbar spine and hips, and slight scoliosis.   (Tr. 170).

Plaintiff returned to Dr. Morris on December 30, 2008, stating that she felt the same since her last visit.   (Tr. 172). Palpation revealed muscular tightness and tenderness in the cervical, thoracic and lumbar sine and the left and right sacroiliac joints, and muscular tightness and tenderness in the left and right trapezius. (Id.) Dr. Morris treated plaintiff with manipulation, electrotherapy and cryotherapy, and noted that plaintiff was progressing as expected.   (Id.)   She returned on December 31, 2008 and reported some headache discomfort, and stated that her neck pain had improved and her upper back pain may have improved.   (Tr. 173).   Plaintiff reported that her sleeping difficulties had improved, but she had pain in her low back, pain and numbness in her left upper leg, numbness in her left foot and toes, and spasm of the toes of her left foot. (Id.) Dr. Morris treated plaintiff with manipulation, electrotherapy and cryotherapy, and noted that plaintiff was progressing as expected. (Id.) Plaintiff saw Dr. Morris several times per week from December 30, 2008 through February 26, 2009. (Tr. 174-204).   On February 9, 2004, plaintiff classified her improvement as "good." (Tr. 194).   She reported being more relaxed, and that bending was

easier.  (Id.)  She characterized her pain as "very mild at the moment" and reported that she could look after herself although doing so was painful.  (Tr. 195).  She reported that she could lift only very light weights, that pain prevented her from walking more than one mile, that she could sit in her favorite chair for as long as she liked, stand as long as she wanted, and travel anywhere, although she experienced extra pain.  (Id.)  She reported that her social life was normal but increased her pain.  (Id.)  During plaintiff's last appointment with Dr. Morris, he wrote that plaintiff had not reached maximum medical improvement, and he recommended that plaintiff see an orthopedic specialist or neurologist for her lower back and leg pain.  (Tr. 174-204).  He wrote that he had given plaintiff a list of doctors that allow patients to pay a deposit and make payment arrangements.  (Tr. 204).

Records from Southwest Medical Center indicate that plaintiff was seen on May 12, 2010 by James S. Compton, M.D. with complaints of pain in the left sacral area, chronic dull pain with shooting down the left leg, chronic dull pain in both legs, and difficulty lifting her legs to ascend stairs, and stated that neither over-the-counter analgesics nor a heating pad provided relief.  (Tr. 206).  Plaintiff reported that she had been using a Lidocaine patch that her sister gave her, and that she had not seen a doctor in 15 years.  (Id.)  She reported that she smoked one pack of cigarettes per week.  (Id.)  Upon examination, plaintiff had pain with flexion and extension of her hip and was able to touch

her toes, but complained of pain.  (Id.)  Dr. Compton's assessment
was "? lumbar strain," and he prescribed Meloxicam.  (Tr. 206).
Dr. Compton opined that plaintiff needed an MRI but had no
insurance, and should get an MRI upon obtaining insurance.  (Id.)
On May 26, 2010, Dr. Compton prescribed Ibuprofen (Motrin).  (Id.)

        On June 10, 2010, plaintiff completed an Orthopedic
History report at Washington University Orthopedics, but there is
no evidence to indicate that she was seen by a Washington
University orthopedist.  In her report, plaintiff reported pain in
her low back, leg, knees and foot, with difficulty walking.  (Tr.
209).  Plaintiff reported having been attacked by a dog in December
of 2008.  (Id.)  She stated that climbing stairs, walking, or
standing longer than 10-15 minutes exacerbated her symptoms.  (Id.)
She reported that she was not working due to pain.  (Id.)
Plaintiff reported that she was taking Ibuprofen and multivitamins,
and that she had been prescribed Meloxicam but was not taking it
presently.  (Tr. 213).  She reported that she smoked one-half pack
of cigarettes per day.  (Id.)

        On June 17, 2010, Suzanne Page completed a physical
residual functional capacity assessment ("PRFCA").  (Tr. 47-52).
In the PRFCA, Ms. Page's role is identified as a "Single
Decisionmaker (SDM)"[5] as opposed to "Medical Consultant (MC)."

---

[5]Missouri is one of ten test states participating in a
prototype test of the SDM model, in which "Disability Examiners
with SDM authority complete all disability determination forms
and make initial disability determinations in many cases without
medical or psychological consultant (MC or PC) signoff."
https://secure.ssa.gov/poms.nsf/lnx/0412015100 (last visited on

(Tr. 52).

Ms. Page opined that plaintiff could lift 20 pounds occasionally and frequently lift 10, and could stand/walk and sit for a total of six hours in an eight-hour workday. (Id.) Ms. Page opined that plaintiff was limited in terms of pushing, pulling, climbing ramps and stairs, kneeling, crouching, crawling, and stooping. (Id.) Ms. Page opined that plaintiff should never climb ladders, ropes or scaffolds. (Id.)

On August 16, 2010, plaintiff was seen by Dr. Compton with continued complaints of low back pain that was worse when she walked or climbed stairs, and that had worsened in the past two years. (Tr. 238). Plaintiff reported that she was taking Ibuprofen. (Id.) Dr. Compton assessed low back pain and wrote that plaintiff needed an MRI. (Id.)

On September 30, 2010, an MRI performed at Open MRI revealed grade I anterolisthesis of L4 on L5 associated with mild disc bulging, disc height loss, and moderate facet osteoarthrosis; mild annular disc bulging at L2-3 and L3-4 with mild bilateral facet arthropathy; and mild facet osteoarthrosis at L5-S1. (Tr. 216).

On November 22, 2010, plaintiff saw neurosurgeon Kurt Eichholz, M.D. at St. Louis University Center for Cerebrovascular and Skull Base Surgery ("St. Louis University Center") with complaints of back and leg pain since 2008. (Tr. 217). Plaintiff

--------------------------------------------------

August 15, 2013).

reported her history of treatment and stated that her symptoms of pain had significantly worsened, and that she could walk only one block. (<u>Id.</u>) She reported that she had smoked five cigarettes per day for 30 years, and drank about two beers per month. (<u>Id.</u>) Upon examination, Dr. Eichholz observed that motor examination revealed full function in all muscle groups, despite plaintiff's "poor effort." (Tr. 218). Sensory examination was intact to light touch, deep tendon reflexes were 2+ and symmetrical, straight leg raise testing was positive on the left for radicular pain, and negative on the right. (<u>Id.</u>) Plaintiff had moderate but not significant pain with palpation of her SI joint, and it was noted that she had a moderate swayback abnormality. (<u>Id.</u>)

Dr. Eichholz's assessment was L4-L5 spondylolisthesis (slippage of one of the bones of the spine out of place onto the vertebra below it) with lumbar stenosis (narrowing) at L4-L5. (<u>Id.</u>) Dr. Eichholz recommended that plaintiff undergo physical therapy if it would be covered by Medicaid, and return in four to six weeks. (Tr. 218). Dr. Eichholz wrote that, if physical therapy was not possible, he would discuss with plaintiff a minimally invasive right L4-L5 transforaminal lumbar interbody fusion with instrumentation. (<u>Id.</u>) He also counseled plaintiff regarding smoking cessation, stating "that would be the most significant indicator for her outcome." (<u>Id.</u>) Plaintiff began physical therapy at St. Louis University Hospital on December 1, 2010. (Tr. 220-37).

Plaintiff returned to Dr. Eichholz on January 31, 2011

and reported continuing complaints of back pain radiating to her legs and foot, and reported that her pain was "bad, if not slightly worse, than it was in November 2010." (Tr. 241).  She reported that she had not stopped smoking. (Id.)  Motor examination was full in all muscle groups, and sensory examination was intact. (Id.)  Straight leg raise testing was positive on the left and negative on the right. (Id.)

Dr. Eichholz noted that the September 30, 2010 MRI showed grade I spondylolisthesis of L4 onto L5 with significant lumbar stenosis at that level, and that plaintiff otherwise had normal lumbar lordosis and no significant abnormalities. (Tr. 242).  Dr. Eichholz noted that a CT scan obtained earlier that day showed no evidence of spondylolysis. (Id.)  Dr. Eichholz's assessment was L4-L5 spondylolisthesis with lumbar stenosis. (Id.)

Dr. Eichholz wrote that he discussed plaintiff's situation with plaintiff and her daughter, noting that physical therapy had not helped plaintiff. (Id.)  Dr. Eichholz wrote that he discussed surgical intervention with plaintiff, but that plaintiff indicated that she lived alone and was worried that there would be no one to care for her following surgery. (Tr. 242).  It is noted that plaintiff indicated that she would discuss the matter with her family. (Id.)  Dr. Eichholz wrote that if plaintiff wished to undergo a minimally invasive right L4-L5 transforaminal lumbar interbody fusion with instrumentation, she should contact his office. (Id.)

On April 21, 2011, Dr. Compton completed a Physical

- 14 -

Residual Functional Capacity Questionnaire.  (Tr. 244-48).  Dr.
Compton reported his diagnosis as degenerative joint disease/lumbar
stenosis with decreased range of motion of the lumbar spine, and
reported plaintiff's prognosis as "fair." (Tr. 244).  He indicated
that plaintiff's impairments had lasted/could be expected to last
for 12 months, and he wrote that plaintiff was not a malingerer.
(Id.)  He indicated that emotional factors did not contribute to
the severity of plaintiff's symptoms and functional limitations.
(Id.)  He indicated that plaintiff's impairments were reasonably
consistent with her symptoms and functional limitations, and opined
that plaintiff would "frequently" experience pain or other symptoms
severe enough to interfere with the attention and concentration
necessary to perform even simple work tasks.  (Tr. 245).  Dr.
Compton wrote that plaintiff was incapable of even "low stress"
jobs.  (Id.)  He wrote that plaintiff could walk less than one city
block without pain, and opined that plaintiff could sit for 15
minutes to less than one hour, and must then walk.  (Id.)  Dr.
Compton opined that plaintiff could stand for 15 minutes to less
than one hour, and would then need to lie down.  (Id.)  He opined
that plaintiff could sit, stand, and walk for less than two hours
in an eight-hour workday.  (Tr. 245).  Dr. Compton indicated that,
during an eight-hour workday, plaintiff would need to walk every
one minute, for a duration of one minute.  (Tr. 246).  He opined
that plaintiff needed a job that allowed for shifting positions.
(Id.)  He opined that plaintiff would require more than ten
unscheduled breaks during a workday, and would need to rest for 45

minutes before returning to work.  (Id.)  Dr. Compton opined that
plaintiff should sit with her legs elevated above her heart, and
that she must use a cane or other assistive device when walking.
(Id.)  He opined that plaintiff could "rarely" lift less than ten
pounds, and "never" lift 10 pounds or greater.  (Tr. 246).  Dr.
Compton opined that plaintiff could "occasionally" turn her head
right or left, hold her head in a static position, look up, or look
down.  (Tr. 247).  He opined that plaintiff could "rarely" twist,
and should never stoop, crouch/squat, or climb ladders or stairs.
(Id.)  He opined that plaintiff had no limitations regarding fine
fingering.  (Id.)  Dr. Compton wrote that plaintiff was "unable to
work."  (Id.)

     On June 16, 2011, Devyani M. Hunt, M.D. of Washington
University Orthopedics wrote that plaintiff should not lift more
than ten pounds or walk for longer than 15 minutes, and should not
bend or stoop.  (Tr. 250).  There is no indication that Dr. Hunt
examined plaintiff.

     C.   Other Evidence

     In a Function Report dated May 12, 2010, plaintiff
indicated that, upon arising, she used the toilet and showered, and
that she stood in the shower because it was difficult to sit in the
tub.  (Tr. 135).  She wrote that she drove five minutes to her
local library twice per week when she was able to walk well to use
the computer/internet services to look for employment and/or to
read.  (Tr. 135, 139).  She ate dinner by 5:30 p.m., watched
television until about 8:00 p.m., and went to bed by 9:30 or 10:00

p.m.  (Id.)  She wrote that she did a very limited amount of cleaning, that doing laundry was difficult because she had to travel steps to get to the machines, and that she needed help with laundry and with taking trash to the curb.  (Tr. 137).  She wrote that she drove for short distances, and was able to shop in stores for food and other products for her home.  (Tr. 138).  She wrote that she could not stand longer than one hour at a time, could only lift five pounds on a good day, could not walk farther than one block due to intense pain and her knees giving out, and she could not kneel or travel stairs without help.  (Tr. 140).  Plaintiff then wrote that she could not stand longer than 30 minutes.  (Id.)  Plaintiff wrote that she always needed to rest for at least one hour, maybe two, before resuming walking.  (Id.)  She wrote that she could pay attention "[a]s long as necessary - 2-3 hours" and could follow written and spoken instructions "well."  (Id.)  She wrote that she got along "very well" with authority figures and that she was "quite adept at handling stress - mentally - I am awesome!  It is my physical capabilities that have gotten weak, causing problems."  (Tr. 141).  Plaintiff wrote that she handled changes in routine "well" unless she had to walk or drive far or stand for long periods.  (Id.)  She wrote that she did not drive or walk far from home due to pain in her lower back, legs and feet.  (Id.)  She indicated that she used a cane that was not prescribed by a doctor.  (Id.)  Plaintiff wrote that she "would Love to find Reasonable, Health Appropriate For Me - Employment that pays well."  (Tr. 142).  She wrote that she sat for 30 to 45 minutes using a

computer.   (Tr. 144).

### III.   The ALJ's Decision

The ALJ in this case determined that plaintiff had the severe impairments of slight scoliosis of the thoracic and lumbar spine and mild degenerative disc disease of the lumbar spine, but did not have an impairment or combination of impairments of listing-level severity.   (Tr. 10-11).   The ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b).   The ALJ concluded that plaintiff was able to perform her past relevant work as a telemarketer and customer service representative, as this work did not require the performance of work-related activities precluded by her RFC.   (Tr. 19).

### IV.   Discussion

To be eligible for benefits under the Social Security Act, plaintiff must prove that she is disabled.   <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Services</u>, 955 F.2d 552, 555 (8th Cir. 1992).   The Social Security Act defines a disabled individual in terms of the effect of a physical or mental impairment upon the individual's ability to function in the workplace.   <u>See</u> 42 U.S.C. § 423(d)(1)(A).   The Act provides for disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

- 18 -

months." Id.  It further specifies that a person must be both
unable to do her previous work and unable, "considering [her] age,
education, and work experience, [to] engage in any other kind of
substantial gainful work which exists in the national economy,
regardless of whether such work exists in the immediate area in
which [she] lives, or whether a specific job vacancy exists for
[her], or whether [she] would be hired if [she] applied for work."
42 U.S.C. § 423(d)(2)(A); see also Bowen v. Yuckert, 482 U.S. 137,
140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the
Commissioner follows a five-step evaluation process. See 20 C.F.R.
§ 404.1520; Bowen, 482 U.S. at 140-42.  The Commissioner begins by
considering the claimant's work activity.  If the claimant is
engaged in substantial gainful activity, disability benefits are
denied.  Next, the Commissioner decides whether the claimant has a
"severe impairment," meaning one which significantly limits her
ability to do basic work activities.  If the claimant's impairment
is not severe, then she is not disabled.  If the claimant's
impairment is severe, the Commissioner then determines whether it
meets or is equal to one of the impairments listed in 20 C.F.R.,
Subpart P, Appendix 1.  If claimant's impairment is equivalent to
one of the listed impairments, she is conclusively disabled.  At
the fourth step, the Commissioner establishes whether the claimant
has the residual functional capacity to perform her past relevant
work.  If so, the claimant is not disabled.  If not, the burden
then shifts to the Commissioner to prove that there are other jobs

that exist in substantial numbers in the national economy that the
claimant can perform.  Pearsall, 274 F.3d at 1217, Nevland v.
Apfel, 204 F.3d 853, 857 (8th Cir.  2000).  Absent such proof, the
claimant is declared disabled and becomes entitled to disability
benefits.

The Commissioner's findings are conclusive upon this
Court if they are supported by substantial evidence.  42 U.S.C. §
405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young
o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf
v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial
evidence is less than a preponderance but enough that a reasonable
person would find  adequate to support the conclusion.  Briggs v.
Callahan, 139 F.3d 606, 608 (8th Cir. 1998).  To determine whether
the Commissioner's decision is supported by substantial evidence,
the Court must review the entire administrative record and
consider:

    1.  The credibility findings made by the ALJ;

    2.  The plaintiff's vocational factors;

    3.  The medical evidence from treating and
        consulting physicians;

    4.  The plaintiff's subjective complaints
        relating to exertional and non-exertional
        activities and impairments;

    5.  Any corroboration by third parties of the
        plaintiff's impairments;

    6.  The testimony of vocational experts, when
        required, which is based upon a proper
        hypothetical question which sets forth
        the plaintiff's impairment.

<u>Stewart v. Secretary of Health & Human Services</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).  This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result.  <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992).

This Court must also consider "evidence which fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991); <u>see</u> <u>also</u> <u>Briggs</u>, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003) (citing <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001)); <u>see</u> <u>also</u> <u>Weikert v. Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted) ("[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision.")

In the case at bar, plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole.  In support, plaintiff argues that the ALJ's reference to "Dr. Ross" was erroneous and alternately that the ALJ improperly weighed evidence from Dr. Morris; erroneously weighed evidence from Drs. Compton and Eichholz; and violated 20 C.F.R. § 404.1527(f)(2) and SSR 96-6p by not acknowledging and discussing the State agency

- 21 -

RFC Assessment.  Plaintiff also contends that the ALJ erroneously failed to inquire how often she could walk, bend, lift, carry, sit or stand, and failed to assess her work-related abilities on a function-by-function basis, and provide a narrative discussion of how the evidence supports each conclusion.  Plaintiff also states that there is no medical evidence supporting the RFC.  In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

    A.   <u>Medical and Opinion Evidence</u>

        1.   <u>Dr. Ross/Dr. Morris</u>

In the context of discussing the records of Dr. Morris, the ALJ wrote that he gave "some evidentiary weight" to the opinion of a doctor he referred to as "Dr. Ross."  (Tr. 12).  Plaintiff complains that, because there is no Dr. Ross involved in this case, the ALJ's reference to Dr. Ross was erroneous.  While plaintiff is correct, the ALJ's misstatement is no more than a harmless typographical error.  Having read the ALJ's decision in its entirety and considering the ALJ's single reference to "Dr. Ross" in the context of the entire opinion, it is quite apparent that the ALJ was referring to the findings of Dr. Morris.  The ALJ's reference to Dr. Ross is nothing more than a harmless typographical or scrivener's error that had no practical effect on the outcome of the case.  It therefore provides no basis to reverse and/or remand the ALJ's decision.  <u>See</u> <u>Hepp v. Astrue</u>, 511 F.3d 798, 806 (8th Cir. 2008) ("an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when

that deficiency had no bearing on the outcome"); <u>Quaite v.</u>
<u>Barnhart</u>, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (whether
misstatement is typographical error is to be determined by reading
misstatement in context of entire opinion).

        Plaintiff next contends that, even if the ALJ could be
understood to refer to Dr. Morris, it was error for the ALJ to give
Dr. Morris's findings weight because Dr. Morris is a chiropractor
and therefore not an "acceptable medical source" as defined in the
Regulations.  Indeed, the Commissioner's Regulations provide that
evidence to establish an impairment must come from "acceptable
medical sources," which are defined as licensed medical or
osteopathic physicians, licensed or certified psychologists,
licensed optometrists, licensed podiatrists, and qualified speech-
language pathologists.  20 C.F.R. § 404.1513(a)(1)-(5).  However,
as the Commissioner correctly notes and as plaintiff fails to
recognize, chiropractors like Dr. Morris are defined in the
Regulations as "other sources" whose opinions may be used to show
the severity of an impairment and how it affects the claimant's
ability to work.  20 C.F.R. § 404.1513(d)(1).  There is no evidence
that the ALJ placed any greater weight than this on Dr. Morris's
findings.  The ALJ's treatment of Dr. Morris's findings is entirely
consistent with the Regulations.

        2.   <u>Dr. Compton</u>[6]

_____

        [6]For the sake of argument, the undersigned will presume that
Dr. Compton is properly characterized as a treating physician,
even though the record indicates that plaintiff saw him only
twice.

In his decision, the ALJ included a lengthy and exhaustive discussion of Dr. Compton's treatment records and residual functional capacity assessment.  After giving multiple reasons, the ALJ wrote that he rejected Dr. Compton's residual functional capacity assessment.  (Tr. 12-15).  Plaintiff argues that the ALJ was not justified in doing so, and that Dr. Compton's opinion is evidence that supports her allegations.  Review of the ALJ's decision reveals no error.

A treating physician's opinion is generally entitled to substantial weight, but it does not automatically control, because the ALJ must evaluate the record as a whole.  Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citing Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004)). When an ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so. Davidson, 501 F.3d at 990 (citing Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002)).  If justified by substantial evidence in the record as a whole, the ALJ can discount the opinion of an examining physician or a treating physician.  See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The ALJ gave several valid reasons for rejecting Dr. Compton's RFC assessment.  The ALJ noted that it was unsupported by medically acceptable clinical and laboratory diagnostic techniques. This finding is supported by the record.  As the ALJ observed, while Dr. Compton opined that plaintiff had serious functional limitations, his treatment records are nearly devoid of mention of

medically acceptable clinical and diagnostic techniques that would support the extreme degree of limitations expressed in the RFC assessment.  For example, while Dr. Compton opined that plaintiff's pain was so severe that it interfered with her attention and concentration, his treatment notes did not indicate that he ever tested plaintiff's concentration or attention.  Also, while Dr. Compton opined that plaintiff was severely limited in her ability to perform various work-related activities, he did not offer, nor does examination of his treatment records indicate, what medical findings support such extreme limitations.  According to the Regulations and to Eighth Circuit precedent, a treating physician's opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques to be entitled to controlling or substantial weight.  20 C.F.R. § 404.1527(d)(3); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).

The ALJ also noted that, instead of documenting objective medical evidence to explain his findings regarding plaintiff's condition, Dr. Compton merely repeated plaintiff's subjective complaints.  An ALJ may discount an opinion that is based largely on a claimant's subjective complaints rather than objective medical evidence.  Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007); see also Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005) (an ALJ was justified in giving less weight to a treating physician's opinion where the physician failed to document objective medical evidence to support subjective complaints).

The ALJ also noted that Dr. Compton's RFC assessment was

inconsistent with his own treatment notes, which contain no reference to a need for plaintiff to elevate her leg above her heart when sitting, or to limit her activity in the extreme manner described in the RFC assessment.   When a treating physician's treatment notes are not consistent with his residual functional capacity assessment, the Commissioner will decline to give controlling weight to the residual functional capacity assessment. See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006); Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's own clinical treatment notes").

The ALJ noted that Dr. Compton's RFC assessment was inconsistent with other medical evidence in the record, including Dr. Eichholz's records.   Indeed, as the ALJ observed, while plaintiff complained of debilitating symptoms and extreme functional limitations, Dr. Eichholz's records and the reports of objective medical testing consistently characterized plaintiff's condition as mild in nature.   See Owen v. Astrue, 551 F.3d 792, 799 (8th Cir. 2008) (objective evidence of mild impairment supported ALJ's decision to give less than controlling weight to the treating physician's opinion).   An ALJ may decline controlling weight to the opinion of a treating physician that is inconsistent with the other medical evidence of record.   Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight").

The ALJ also appropriately characterized Dr. Compton's opinions as merely conclusory.  Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996) (It is appropriate to disregard statements of opinion by a treating physician that "consist[s] of nothing more than vague, conclusory statements").  Also notable is the fact that Dr. Compton expressed his opinion by checking boxes and circling numbers.  A treating physician's check marks on a questionnaire are conclusory opinions that may be discounted if, as in this case, they are contradicted by other objective medical evidence in the record, especially when that other evidence is that doctor's own records.  See Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); see also Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (a physician's check marks on a medical source statement form merely address the claimant's residual functional capacity to work, which is a determination the Commissioner must make).

The ALJ observed that, while Dr. Compton indicated in his RFC assessment that he saw plaintiff three times in 18 months, the administrative record reveals that he saw plaintiff only twice.  The ALJ also noted that Dr. Compton did not perform an examination of plaintiff before preparing the RFC questionnaire.  When deciding "how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations."  Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007).  The ALJ also noted that, while Dr. Compton observed that physical therapy did not help plaintiff, he failed to note that plaintiff attended only three sessions.  While not

dispositive, this is further evidence undermining Dr. Compton's opinion.

Noting that Dr. Compton made findings based partially on plaintiff's alleged emotional impairments, including that she was incapable of performing even a low stress job, the ALJ wrote that Dr. Compton was not a mental health professional, and such opinions were therefore outside his area of practice.  See 20 C.F.R. § 404.1527(d)(5) (a source's opinion on issues outside his or her area of specialty are not entitled to greater weight).  In addition, plaintiff's own statements are inconsistent with Dr. Compton's opinion in this regard.  In a May 12, 2010 Function Report, plaintiff wrote that she was "quite adept at handling stress - mentally - I am awesome!"  (Tr. 141).

Finally, Dr. Compton opined that plaintiff was unable to work.  This is not the sort of opinion that the ALJ is required to credit.  Ellis, 392 F.3d at 994-95 (physician's opinion that claimant is unable to work involves an issue reserved for the Commissioner and is not the type of opinion which the Commissioner must credit).

The ALJ fully considered Dr. Compton's opinion in light of the record as a whole, and provided multiple valid reasons for rejecting it.  Substantial evidence supports the ALJ's treatment of Dr. Compton's RFC assessment.

    3.  Dr. Eichholz

In his decision, the ALJ wrote that he gave substantial weight to Dr. Eichholz's findings.  Plaintiff alleges error,

arguing that the ALJ did not explain the reasons given for the weight assigned to Dr. Eichholz's opinion.  Review of the record reveals no error.  The ALJ's decision includes a comprehensive discussion of Dr. Eichholz's treatment records and findings.  As the ALJ observed, Dr. Eichholz's findings were based upon medically acceptable clinical and laboratory diagnostic techniques, including an MRI showing mild findings, a CT scan showing no evidence of spondylolysis, and examination findings indicating full motor strength in all muscle groups, intact response to sensation, and positive straight leg raise testing at 90 degrees but no significant pain in the sacroiliac joint or left greater trochanteric regions.  The ALJ also noted Dr. Eichholz's status as an associate professor of neurological surgery at St. Louis University Hospital.  As the Commissioner correctly notes, Dr. Eichholz is properly recognized as a specialist in neurological and spinal issues.  The opinions of specialists on issues within their areas of expertise are generally entitled to more weight than the opinions of non-specialists.  20 C.F.R. § 404.1527(d)(5); Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005).

The ALJ also observed that plaintiff did not pursue the surgical intervention Dr. Eichholz offered, and that this detracted from the credibility of her subjective allegations.  Plaintiff alleges error, arguing that Dr. Eichholz's recommendation of surgery supports her subjective allegations.  Plaintiff also notes that she had no one to care for her following surgery, an apparent attempt to explain her reason for refusing surgery.  Review of the

ALJ's decision reveals no error.

While Dr. Eichholz's recommendation of surgery is not inconsistent with allegations of pain, it does not alone support plaintiff's allegations that she is completely and totally disabled from all work. The ALJ in this case did not determine that plaintiff had no pain or limitations. He limited plaintiff to light work, which represents significant functional limitations. See Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006) (citing Ellis, 392 F.3d at 994 (the limitation to light work represents significant functional limitations).

Plaintiff argues that the ALJ erroneously observed that plaintiff's condition did not require surgery when in fact Dr. Eichholz recommended surgery. However, the ALJ did not state that surgery was never recommended. Quite to the contrary, the ALJ fully discussed Dr. Eichholz's treatment records and noted that he offered plaintiff surgery but that plaintiff evidently chose to not pursue it. Eighth Circuit precedent permits an ALJ to make an adverse inference from a claimant's failure to avail herself of recommended treatment. Guilliams, 393 F.3d at 802. Plaintiff's suggestion that she did not pursue surgery because she had no one to care for her afterwards is not compelling. During the administrative hearing, plaintiff testified that she had serious functional limitations, and that her daughter came to her house to help her. Plaintiff testified that her daughter came to her house to help her with housework (Tr. 30), and that her daughter also went to the grocery store with her. (Id.) Plaintiff also

- 30 -

testified that she had trouble bending forward, and sometimes called her daughter to come over and help her get dressed. (Tr. 34-35). Plaintiff also testified that her daughter visited her and brought her baby and her laptop computer. (Tr. 30, 37). In addition, Dr. Eichholz's records indicate that plaintiff's daughter accompanied plaintiff to the appointment. Plaintiff already receives what is apparently a lot of assistance from her daughter. This belies the conclusion that the unavailability of help was the reason plaintiff did not pursue surgery. It appears more likely that plaintiff did not pursue surgery because she did not feel a need for it. Substantial evidence supports the ALJ's treatment of Dr. Eichholz's findings.

### 4. State Agency PRFCA

Plaintiff also contends that the ALJ's decision should be reversed because he violated 20 C.F.R. § 404.1527(f)(2) and SSR 96-6p by stating that there was no State agency medical evaluation when in fact there was. In her brief, plaintiff argues that "findings regarding the nature and severity of an impairment made by State agency consultants and other program physicians and psychologists 'must be treated as expert opinion evidence of nonexamining sources,' and ALJs "'may not ignore these opinions and must explain the weight given to these opinions in their decisions.'" (Docket No. 15 at 11). In the Brief In Support Of The Answer, the Commissioner offers no response to this allegation of error. See (Docket No. 18). Plaintiff's argument is unavailing.

The ALJ was correct that there was no State agency

*medical* evaluation.   Ms. Page, the signatory who completed the PRFCA, is identified not as a Medical Consultant but as a "Single Decisionmaker (SDM)" (Tr. 52).   A Single Decisionmaker is a nonmedical, or lay, State agency evaluator.   The authority plaintiff cites, 20 C.F.R. § 404.1527(f)(2) and SSR 96-6p, addresses the manner in which an ALJ is required to treat agency *medical* sources, and therefore provides no basis for reversal. Plaintiff does not offer, nor does independent research reveal, any authority to support the conclusion that the ALJ erred by not specifically addressing the opinion of the Single Decisionmaker.

The ALJ's decision in this case was very thorough. Nothing about the decision raises suspicion that the ALJ carelessly or willfully ignored any evidence.   An ALJ is not required to discuss in detail every piece of evidence submitted, and a failure to cite to certain evidence does not mean it was not considered. Brewster v. Barnhart, 366  F.Supp. 2d 858, 872 (E.D. Mo., 2005), citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

Review of the ALJ's decision shows that he properly considered all of the evidence in the record as a whole in deciding how to weigh the medical evidence of record, and provided multiple valid reasons for the weight assigned.

    B.   RFC Determination

Plaintiff next challenges the ALJ's RFC determination, arguing that it was unsupported by medical evidence, that Dr. Compton's opinion is the only medical evidence establishing plaintiff's RFC, that the ALJ did not include findings with respect

to her ability to sit, stand, walk, lift, carry, push and pull, and did not assess her work-related abilities on a function by function basis.  Review of the ALJ's decision reveals no error.

Residual functional capacity is defined as that which a person remains able to do despite her limitations.  20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  20 C.F.R. § 404.1545; Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793.

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination.  Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712.  However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863.  The claimant bears the burden of establishing her RFC.  Goff, 421 F.3d at 790.

As the Commissioner argues, a claimant's statements alone will not establish disability.  There must be medical signs and laboratory findings showing an impairment which could reasonably be expected to produce the symptoms alleged and which, when considered with all of the other evidence, would lead to the conclusion that the claimant is disabled.  20 C.F.R. § 404.1529.  In this case, there are no such signs or findings that support plaintiff's allegations.  Instead, the medical evidence of record supports the ALJ's RFC determination.  For example, Dr. Eichholz's 2010 and 2011 examinations revealed full motor function in all muscle groups, and intact response to sensation.  The findings from MRI and CT testing were generally described and interpreted as mild.  Objective medical findings did not include significant deficits in plaintiff's abilities to squat, stand, walk, sit, lift, carry, bend, or stoop, lasting for 12 months.  There is no objective evidence of long-term, significant spasm, nor is there such evidence of the atrophy which may be expected if plaintiff was as inactive as she asserts.  While plaintiff argues that Dr. Compton's RFC assessment should be used to establish her RFC, the ALJ properly considered and rejected that assessment, and was therefore under no obligation to include such limitations in his RFC.  The ALJ's RFC determination is also supported by his legally sufficient conclusion that plaintiff's subjective allegations were not fully credible, a finding that plaintiff does not specifically challenge.  While plaintiff is correct that an ALJ's RFC determination must be supported by some medical evidence, "the burden of persuasion to

prove disability and demonstrate RFC remains on the claimant."
Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010).  Plaintiff
herein cannot demonstrate that her functional limitations are
greater than those described in the ALJ's RFC assessment.  An RFC
assessment draws from medical sources for support, but RFC is
ultimately an administrative decision reserved to the Commissioner.
Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citations
omitted).

　　　　Plaintiff also contends that the ALJ failed to assess her
work-related limitations on a function by function basis, and did
not specifically inquire into how long she could walk, bend, lift,
carry, sit or stand.   Indeed, an ALJ should "identify the
individual's functional limitations or restrictions and assess his
or her work-related abilities on a function-by-function basis,"
including functions such as sitting, standing, and walking.
Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003) (quoting
S.S.R. 96-8p, 1996 WL 374184, at *1).  In Depover, the Eighth
Circuit noted that an ALJ's failure to make a function by function
assessment "could result in the adjudicator overlooking some of an
individual's limitations or restrictions."  Id.  The Depover Court
noted that, in Pfitzner v. Apfel, 169 F.3d 566, 568-69 (8th Cir.
1999), the ALJ's decision was reversed on this basis because the
ALJ had failed to "specify the details" of the claimant's RFC, and
instead described it "only in general terms," leaving it unclear
whether substantial evidence supported the ALJ's decision that the
claimant could return to his past relevant work.   Id.

In the case at bar, however, (as in <u>Depover</u>) the ALJ did not merely describe plaintiff's RFC in "general terms."  <u>See</u> <u>Id.</u> Instead, as noted above, the ALJ conducted a detailed analysis of the evidence of record and of plaintiff's testimony, and formulated a specific RFC that took into account all of plaintiff's limitations that the ALJ found credible and supported by the record.  While the ALJ did not present his findings in a bullet-point format, such a rigid format is not required, as plaintiff seems to suggest.  An ALJ is not required to affirmatively prove that a claimant can lift a certain weight or walk a certain distance.  <u>Pearsall</u>, 274 F.3d at 1217 (8th Cir. 2001); <u>McKinney</u>, 228 F.3d at 863.

Review of the ALJ's RFC determination reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole.  Having reviewed the ALJ's decision with the requisite deference, the undersigned concludes that it is supported by substantial evidence on the record as a whole.

Therefore, for all of the foregoing reasons, on the claims that plaintiff raises,

**IT IS HEREBY ORDERED** that the Commissioner's decision is affirmed, and plaintiff's Complaint is dismissed with prejudice.


_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE


Dated this 16th day of August, 2013.